**BRIDGES v. WIXON, District Director, Immigration and Naturalization Service, Department of Justice.**

No. 10450.

Circuit Court of Appeals, Ninth Circuit.

June 26, 1944.

Rehearing Denied Sept. 27, 1944.

Lee Pressman, Congress of Industrial Organizations, of Washington, D. C., Carol King, of New York City, and Gladstein, Grossman, Sawyer & Edises, Richard Gladstein, and Aubrey Grossman, all of San Francisco, Cal., for appellant.

Tom C. Clark, Asst. Atty. Gen., Edward G. Jennings, Sp. Asst. to the Atty. Gen., and John Ford Baecher, Atty., Department of Justice, of Washington, D. C., and Frank J. Hennessy, U. S. Atty., of San Francisco, Cal., for appellee.

Osmond K. Fraenkel and Benedict Wolf, both of New York City, for National Lawyers Guild, as amicus curiae.

Before WILBUR, GARRECHT, MATHEWS, STEPHENS, and HEALY, Circuit Judges.

WILBUR, Circuit Judge.

The appellant, in custody of the respondent under a warrant for deportation, sought

release by habeas corpus in the District Court for the Northern District of California. That court issued an order to show cause and, upon the showing made by the return and traverse, denied the petition and remanded the petitioner to the custody of the respondent. From that order the petitioner appeals to this court. The appellant attached to his petition for a writ a transcript of the entire proceedings before the Inspector who ordered deportation, the record of petitioner's appeal before the Appeal Board set up by the Attorney General, which recommended against deportation, and the final order of the Attorney General upon a review of the Appeal Board's decision ordering the deportation of the petitioner.

While the power of the District Court and of this court in such an application is well settled, in view of the wide range of the argument it is well to state again the limits of the court's authority in the premises.

The statute providing for deportation of undesirable aliens by the Attorney General provides that:

"In every case where any person is ordered deported from the United States under the provisions of this chapter, or of any law or treaty, the decision of the Attorney General shall be final." 8 U.S.C.A. § 155(a).

■ Thus the court has no power derived from Congress to review or to inquire into the truth of the charge against the alien, nor into the manner in which the decision has been reached by the Attorney General. The right of the court to consider the validity of the order of deportation at all is derived directly from the Fifth Amendment to the Constitution of the United States, which prohibits a deprivation of liberty or property without due process of law.

■ The Supreme Court, in United States v. Ju Toy, 198 U.S. 253, 255, 25 S. Ct. 644, 49 L.Ed. 1040, stated the rule controlling the court in such a case as follows:

"Where the law has confided to a special tribunal authority to hear and determine matters arising in the course of its duties, a decision by it within the scope of its authority as to questions of fact is conclusive against collateral attack. Where the jurisdiction depends upon a question of fact which is the very gist of the controversy, the determination of that is generally final. [citing cases]

"Where the decision of questions of fact is committed by Congress to the head of a Department, his decision thereon is conclusive; * * *."

This last statement is subject only to a court review upon the question of due process under the Fifth Amendment to the Constitution.

■ In Zakonaite v. Wolf, 226 U.S. 272, 275, 33 S.Ct. 31, 32, 57 L.Ed. 218, it is said, (Mr. Justice Pitney writing the opinion):

"It is entirely settled that the authority of Congress to prohibit aliens from coming within the United States, and to regulate their coming, includes authority to impose conditions upon the performance of which the continued liberty of the alien to reside within the bounds of this country may be made to depend; that a proceeding to enforce such regulations is not a criminal prosecution within the meaning of the 5th and 6th Amendments; that such an inquiry may be properly devolved upon an executive department or subordinate officials thereof, and that the findings of fact reached by such officials, after a fair though summary hearing, may constitutionally be made conclusive, as they are made by the provisions of the act in question."

■ In Tisi v. Tod, 264 U.S. 131, 133, 44 S.Ct. 260, 68 L.Ed. 590, it is said (Mr. Justice Brandeis writing the opinion):

"We do not discuss the evidence, because the correctness of the judgment of the lower court is not to be determined by enquiring whether the conclusion drawn by the Secretary of Labor from the evidence was correct, or by deciding whether the evidence was such that, if introduced in a court of law, it would be held legally sufficient to prove the fact found.

■ "The denial of a fair hearing is not established by proving merely that the decision was wrong. Chin Yow v. United States, 208 U.S. 8, 13, 28 S.Ct. 201, 52 L. Ed. 369. This is equally true whether the error consists in deciding wrongly that evidence introduced constituted legal evidence of the fact or in drawing a wrong inference from the evidence. The error of an administrative tribunal may, of course, be so flagrant as to convince a court that the hearing had was not a fair one. Compare United States ex rel. Bilokumsky

932

v. Tod,[1] 263 U.S. 149, 44 S.Ct. 54, 68 L. Ed. [221]; Kwock Jan Fat v. White,[2] 253 U.S. 454, 40 S.Ct. 566, 64 L.Ed. 1010; Zakonaite v. Wolf, 226 U.S. 272, 33 S.Ct. 31, 57 L.Ed. 218; Tang Tun v. Edsell, 223 U.S. 673, 32 S.Ct. 359, 56 L.Ed. 606. * * * Under these circumstances, mere error, even if it consists in finding an essential fact without adequate supporting evidence, is not a denial of due process of law."

In United States ex rel. Vajtauer v. Commissioner of Immigration, 273 U.S. 103, 110, 47 S.Ct. 302, 305, 71 L.Ed. 560 (Mr. Justice Stone, now Chief Justice, writing the opinion) it is said:

"But we find it unnecessary to consider this question [a question of burden of proof], as we think that the record taken as a whole and without the aid of any statutory presumption presents some evidence supporting the deportation order."

■ We have consistently followed the decisions of the Supreme Court in this circuit upon this subject. In Whitty v. Weedin, 9 Cir., 68 F.2d 127, 130, in considering an appeal from a decision of the trial court denying release by habeas corpus where the defendant was held under a deportation warrant, it is said:

"The point to be determined by us is whether the appellant had a fair hearing, and, if it appears from the record that he had, we are not at liberty to disturb the decision of the lower court. The truth of the facts is for the determination of the immigration tribunals, and where its procedure and decision are not arbitrary or unreasonable, and the alien has had a fair hearing, the result must be accepted."

This decision was followed and quoted in a similar case: Monji Uyemura v. Carr, 9 Cir., 99 F.2d 729. See also, our decision in Chin Share Nging v. Nagle, 9 Cir., 27 F.2d 848; Mui Sam Hun v. United States, 9 Cir., 78 F.2d 612.

The Supreme Court applied the rule in the late case of Costanzo v. Tillinghast, 287

U.S. 341, 342, 53 S.Ct. 152, 153, 77 L.Ed. 350, wherein it is said:

"The Circuit Court of Appeals properly negatived the asserted absence of any evidence to support the action of the Secretary of Labor, and therefore refused, as we do, to review that officer's findings." [citing cases]

■ Under the Fifth Amendment, as these authorities clearly show, deprivation of liberty in the execution of the deportation statute without due process of law is not countenanced and victims of such practice may come to the courts for relief by filing petitions for the issuance of the writ of habeas corpus. The courts can act in no other manner.

■ The courts have uniformly held that Congress cannot authorize a deprivation of liberty without due process of law as provided in the Constitution by the device of making the fact findings of an administrative board conclusive on the courts. That is to say, findings made without supporting evidence or without a hearing before the administrative body or officer are held by the courts to be void. Hence, on this purely collateral proceeding in habeas corpus, the validity of the order of the Attorney General for detention for deportation may be questioned but only to the extent necessary to determine whether there has been a denial of due process by the Attorney General. The parties recognize the rule, but their argument of facts in some instance extends far beyond our power of examination. In effect they ask us to do what is condemned in Federal Trade Commission v. Algoma Lumber Co., 291 U.S. 67, 54 S.Ct. 315, 78 L.Ed. 655, "pay lip service" to the statute.

■ The petitioner claims that the Attorney General applied an erroneous rule as to the Government's burden of proof and argues that the Government should establish its case beyond a reasonable doubt and that we are to judge whether or not this burden has been sustained. This whole

---

[1] In the cited case (opinion of Justice Brandeis) the alleged alien was being examined in a deportation proceeding and statements made by him while confined by state authorities were introduced in evidence. In a subsequent habeas corpus proceeding it was claimed that this was not legal evidence. The Supreme Court rejected the claim.

[2] In the cited habeas corpus proceeding (opinion by Judge Clarke), had after

the subject of the habeas corpus petitions had been denied entry to this country by immigration authorities, it was shown that the transcript sent the Commissioner of Immigration omitted evidence that the subject was confronted by three persons who recognized him as the person he claimed to be. The Supreme Court held the order denying entry void as the subject had not been accorded "due process."

contention is erroneous as the authorities hereinbefore cited indisputably show. The case of Schneiderman v. United States, 320 U.S. 118, 63 S.Ct. 1333, 87 L.Ed. 1796, cited by appellant does not support this view and that decision has no application here. In that case the Supreme Court was reviewing a decision by a District Court and a Circuit Court of Appeals in equity revoking an order or decree admitting Schneiderman to citizenship. The rule there stated is for the guidance of federal courts exercising equity jurisdiction. The rule there applied by the courts is not applicable to a hearing on habeas corpus to determine whether or not the petitioner has had a fair hearing where the rule is that findings of the administrative body are conclusive if supported by evidence.

▆▆▆ Congress, of course, could have given the courts jurisdiction over the subject of ordering aliens from the country as it gave the courts jurisdiction over the subject of naturalization of aliens and of the cancellation of naturalization decrees, but it did not do so. Instead, it set up elaborate official machinery for the handling of this subject, which formerly was under the operation of other executive departments of the Government but which is now operated by the Department of Justice, of which the Attorney General is the administrative head. Our decision upon this appeal must be against the appellant if we discover in the record any evidence supporting the finding of the Attorney General. Thus his decision as to the weight and effect of the evidence is conclusive.

Congress has provided for the deportation of aliens belonging to or affiliated with certain subversive organizations described in the statute (8 U.S.C.A. § 137), from which we quote as follows:

"Any alien who, at any time, shall be or shall have been a member of any one of the following classes shall be excluded from admission into the United States:

> \*　　\*　　\*　　\*　　\*

"(c) \* \* \* Aliens who \* \* \* are members of or affiliated with any organization, association, society, or group, that believes in, advises, advocates, or teaches: (1) the overthrow by force or violence of the Government of the United States \* \* \*

"(e) \* \* \* Aliens who are members of or affiliated with any organization, association, society, or group, that writes, circulates, distributes, prints, publishes, or displays, or causes to be written, circulated, distributed, printed, published, or displayed, or that has in its possession for the purpose of circulation, distribution, publication, issue, or display, any written or printed matter of the character described in paragraph (d) [advising, advocating, or teaching the overthrow by force or violence of the Government of the United States].

"(f) Definition of advising, advocacy, teaching, or affiliation. For the purpose of this section: (1) the giving, loaning, or promising of money or anything of value to be used for the advising, advocacy, or teaching of any doctrine above enumerated shall constitute the advising, advocacy, or teaching of such doctrine; and (2) the giving, loaning, or promising of money or anything of value to any organization, association, society, or group of the character above described shall constitute affiliation therewith; but nothing in this paragraph shall be taken as an exclusive definition of advising, advocacy, teaching, or affiliation.

"(g) Deportation. Any alien who was at the time of entering the United States, or has been at any time thereafter, a member of any one of the classes of aliens enumerated in this section, shall, upon the warrant of the Attorney General, be taken into custody and deported in the manner provided in sections 101, 102, 105, 108, 109, 113, 115, 116, 132, 136, 138, 139, 142–156, 158–166, 168, 169, 171, 173, 175, 177, and 178 of this title. The provisions of this section shall be applicable to the classes of aliens mentioned therein, irrespective of the time of their entry into the United States."

The Attorney General, acting under § 137(g), supra, issued a warrant for appellant's arrest on February 14, 1941. Hearing was had before the Inspector, beginning March 31, 1941 and ending June 12, 1941, occupying substantially all of forty-two trial days. Appellant was there represented by three attorneys of his own choice and was accorded full opportunity to subpoena witnesses, introduce evidence, and cross-examine witnesses. Appellant testified extensively in his own behalf and, in addition, presented testimony of twenty-nine other witnesses and numerous exhibits. A shorthand reporter took down the entire proceeding; the transcript of his notes occupies 6,972 pages of the printed record before us.

934

The Inspector decided in favor of the Government and appellant appealed to the Appeal Board which received further briefs and heard oral argument, and reversed the decision of the Inspector. Thereafter the Attorney General, upon the record, reviewed the matter and made the following findings of fact and conclusions of law:

"* * * I make the following Findings of Fact and Conclusions of Law, proposed by Judge Sears, to wit:

"Findings of Fact

"1. That Harry Renton Bridges is an alien, to wit, a native and citizen of Australia;

"2. That said alien entered the United States at the port of San Francisco, California, April 12, 1920, as a member of the crew of the barkentine Ysabel;

"3. That the Communist Party of the U.S.A., from the time of its inception in 1919 to the present time, is an organization that believes in, advises, advocates, and teaches the overthrow by force and violence of the Government of the United States;

"4. That the Communist Party of the U.S.A., from the time of its inception to the present time, is an organization that writes, circulates, distributes, prints, publishes, and displays printed matter advising, advocating, or teaching the overthrow by force and violence of the Government of the United States;

"5. That the Communist Party of the U.S.A., from the time of its inception to the present time, is an organization that causes to be written, circulated, distributed, printed, published, and displayed printed matter advising, advocating, and teaching the overthrow by force and violence of the Government of the United States;

"6. That the Communist Party of the U.S.A., from the time of its inception to the present time, is an organization that has in its possession for the purpose of circulation, distribution, publication, issue, and display, printed matter advising, advocating, and teaching the overthrow by force and violence of the Government of the United States;

"7. That the Marine Workers' Industrial Union was a part of the Communist Party, dominated and controlled by it;

"8. That the Marine Workers' Industrial Union was an organization that believed in, advised, advocated, and taught the overthrow by force and violence of the Government of the United States;

"9. That after entering the United States the alien has been a member of the Communist Party;

"10. That after entering the United States the alien has been affiliated with the Communist Party;

"11. That after entering the United States the alien has been affiliated with the Marine Workers' Industrial Union.

"Conclusions of Law.

"That under the Act of October 16, 1918, as amended by the Acts of June 5, 1920, and June 28, 1940, the alien Harry Renton Bridges, is subject to deportation in that:

"1. After entering the United States he has been a member of an organization, association, society, or group that believes in, advises, advocates, and teaches the overthrow by force and violence of the Government of the United States;

"2. That after entering the United States the alien has been affiliated with an organization, association, society, or group that believes in, advises, advocates, and teaches the overthrow by force and violence of the Government of the United States;

"3. That after entering the United States the alien has been a member of an organization, association, society, or group that writes, circulates, distributes, publishes, and displays printed matter advising, advocating, and teaching the overthrow by force and violence of the Government of the United States;

"4. That after entering the United States the alien has been affiliated with an organization, association, society, or group that writes, circulates, distributes, publishes, and displays printed matter advising, advocating, and teaching the overthrow by force and violence of the Government of the United States;

"5. That after entering the United States the alien has been a member of an organization, association, society, or group that caused to be written, circulated, distributed, published, printed, and displayed, printed matter advising, advocating, and teaching the overthrow by force and violence of the Government of the United States.

"/s/Francis Biddle,
"May 28, 1942. Attorney General."

As it is admitted that petitioner is an alien, a citizen of Australia, the only question before us is as to his membership in

or affiliation with proscribed organizations. As to that, the question, and the only question which we are authorized to decide, is not whether the petitioner is a member of the Marine Workers' Industrial Union or the Communist Party, or is affiliated with either, or whether such organizations are subversive organizations, but whether or not there was evidence in the hearing before the Inspector, and therefore before the Attorney General, from which inferences could reasonably be drawn in support of the facts found.

 Harry Lundeberg, president of the Maritime Federation of the Pacific, testified that the appellant had stated to him in the summer of 1935 that he was then a member of the Communist Party. This evidence was competent as an admission of the appellant. The question of the credibility of this witness, and the weight of the supporting and the conflicting evidence, finally lie wholly within the conclusive fact finding power of the Attorney General and are beyond our power of review. For the same reason, if there is evidence to support the finding of affiliation with the Marine Workers' Industrial Union, or the findings that these organizations, or either of them, were subversive, we may not weigh it against the contrary evidence. As to the subversive character of the Communist Party of the United States, there is evidence that in July 1929 "The Communist", a magazine published and circulated by the Communist Party, contained the following statement concerning the purpose of the Communist Party in the United States which clearly shows its purpose to change our government by force and violence:

"When Communists urge strikes and crippling of industry in time of war we are accused of trying to bring about the defeat of 'our own' government. To that charge we plead guilty. That is precisely our aim. A government engaged in warfare is weaker than at other times in spite of the fact that its savage repressions make it appear strong to the superficial observer. At such a moment an organized drive to stop the production of war supplies, to cripple the transportation system may result in creating such difficulties that the imperialist forces may be defeated.

"But it is not sufficient in our drive against imperialist war merely to concentrate upon the war industries. We must be able to reach the masses in the armed forces of the nation with revolutionary agitation and propaganda calculated to cause defections and mutiny in the ranks.

"We do not indulge in the social, democratic twaddle about disarmament. We will not tell the soldiers in the army to throw away their guns and run home. We tell them to hold their guns in their hands and use them against their own capitalist oppressors. When faced with an imperialist war as an accomplished fact we must be able to popularize definite revolutionary slogans among the armed forces. In case of a war between imperialist nations we raise the slogan of fraternization with the soldiers of the opposing army, refusal to obey commands of officers, mutinies, and other forms of disruptive work. In case of a war against the Soviet Union our main slogan will be different. We will then urge the soldiers in the imperialist armies to desert the army and with their guns and as much ammunition as they can get, go over to the side of the Red Army against the imperialistic forces.

"While the capitalists prepare for another imperialist war, we prepare to utilize the difficulties for capitalism arising out of such a war in order to initiate the next stage of the world revolution.

"We realize that such a conflict requires careful preparation under the leadership of a determined Bolshevik party. Turning an imperialist war between nations into a civil war against capitalism is not a simple matter, it is not a game for dilettantes to play. It requires the most highly developed revolutionary strategy and an ability to estimate the relative forces involved in the struggle as well as the precise moment for the launching of the insurrection.

"When a revolutionary situation is developing, as a result of war or from any other cause, the party of the proletariat must lead a direct attack against the capitalist state. The slogans put forth must be of such a nature as to guide the movement in its development, which will take the form at first of mass strikes and armed demonstrations. In that stage there arises the question of arming of the working class and disarming the capitalist class. Finally the highest form of struggle is reached wherein it culminates in the general strike and a merging of large sections of the military forces and the workers for armed insurrection against the capitalist state power."

There is a vast volume of evidence in the record upon this subject which we have painstakingly examined but which we do

not discuss for the reason that when we have pointed out this extract from the Communist magazine, we need go no further since it unquestionably constitutes evidence in support of the finding that the Communist Party advocates rebellion. The record thus shows evidence, firstly, that the appellant had been a member of the Communist Party since he entered this country and, secondly, that the Communist Party believed in, advocates and teaches the overthrow by force and violence of the Government of the United States. Congress has authorized the deportation, upon warrant of the Attorney General, of aliens who belong or have belonged to such an organization. 8 U.S.C.A. § 137, supra.

■ Prior deportation proceedings were instituted against the appellant in 1938 under 8 U.S.C.A. § 137 as it then stood, providing for deportation of members of subversive organizations. During the progress of the proceedings the Supreme Court interpreted the statute to apply only to those who were members of such organizations at the time deportation proceedings were instituted. Kessler v. Strecker, 307 U.S. 22, 59 S.Ct. 694, 83 L.Ed. 1082. The Inspector who was in charge of the hearing concluded that the appellant had terminated his connection, if any, with the Communist Party prior to the institution of the proceedings and therefore dismissed the proceedings for the warrant of deportation. Thereafter, Congress, on June 28, 1940, modified the act to apply to any alien who was "at the time of entering the United States, or has been at any time thereafter, a member" of an excluded class of aliens, including past or present members or affiliates of subversive organizations. (54 Stat. 673, 8 U.S.C.A. § 137(g). Thereafter the proceedings now under attack were inaugurated and were heard before a different Inspector. Such later hearing resulted in the order of deportation now under attack.

We recite this history as an aid to the understanding of a number of legal points raised by appellant which we shall now proceed to treat. It is claimed that the decision by the Inspector in the first proceeding is res judicata on the question now before us. The question before the Inspector in the earlier case relates only to whether or not the appellant was at the time of the institution of the proceedings a member of or was an affiliate of a proscribed organization and did not cover the question in the present case which is as to whether or not the appellant has been at any time since his arrival in this country a member or affiliate of such an organization.

■ It is also claimed that the appellant has been subject to double jeopardy in violation of the Constitution of the United States. The principle of double jeopardy applies only to criminal proceedings. This is not a criminal proceeding.

■ It is claimed that the act of 1940 is an ex post facto law in that it permits deportation for conduct prior to the enactment of the amended law. The constitutional prohibition against ex post facto laws applied only to criminal proceedings. A proceeding for deportation is not a criminal proceeding and is not intended nor designed to punish crime.

■ Appellant argues that the evidence of Lundeberg was so unworthy of credence that it should be held as a matter of law to be of no weight whatever. It is not for us to say whether or not the Attorney General was justified in accepting it as sufficient proof of the facts stated by Lundeberg, namely, that Bridges had stated to him that he was a member of the Communist Party. To assert that the Attorney General was bound to disbelieve the evidence of this witness would be to invade his province and to assume the obligation of determining the facts. Congress, acting within its legislative power, has effectively prohibited the determination of the facts by any court or any body other than the Attorney General. 8 U.S.C.A. § 155(a), supra. We do not mean to say that we would be bound to consider any testimony received in the case as beyond our question. Testimony, of course, could be so inherently impossible or improbable of belief that its receipt or its acceptance as proof would be an abuse of the administrative discretion but we have no such instance here. Because we cannot weigh the credence to be given the testimony of Lundeberg, we do not recite in detail the evidence which is claimed to discredit his testimony. Such evidence is to the effect that Lundeberg was hostile to the appellant, and that he had made prior statements that he did not know whether or not the appellant was a member of the Communist Party.

■ It was claimed by the immigration authorities that one O'Neil had made statements to them (one a shorthand re-

porter who claims to have taken the statements in shorthand at the time) that he had seen the appellant pasting stamps in his Party Book, such stamps indicating that the appellant was paying dues to the Communist Party. O'Neil was called as a witness by the immigration authorities and denied that he knew anything about appellant's relation to the Communist Party, although he claims to have told only the truth to the authorities. His contradictory statements made to the authorities were then admitted in evidence, including the transcription of the reporter's shorthand notes. Appellant claims that the admission and consideration of these asserted statements by O'Neil rendered the deportation proceeding unfair and void. Neither the Inspector nor the Attorney General is bound by the common law rules of evidence, and it is not true that the reception of incompetent or hearsay evidence is a ground for treating the decision of the Inspector and Attorney General as void. There being evidence to support the finding of the Inspector and Attorney General that the appellant was a member of the Communist Party, the acceptance of additional evidence of less probative value by the Inspector and the Attorney General cannot avail the appellant in this collateral proceeding. The applicable rule was stated in United States ex rel. Bilokumsky v. Tod, 263 U.S. 149, 157, 44 S.Ct. 54, 57, 68 L.Ed. 221, as follows:[3]

"Moreover, a hearing granted does not cease to be fair, merely because rules of evidence and of procedure applicable in judicial proceedings have not been strictly followed by the executive; or because some evidence has been improperly rejected or received. Tang Tun v. Edsell, 223 U.S. 673, 681, 32 S.Ct. 359, 56 L.Ed. 606."

We may add with propriety that it is a heavy burden to decide which person told the truth in the direct conflict occurring in the testimony of Lundeberg and Bridges and in the asserted statement of O'Neil and the testimony of Bridges. The statement by Lundeberg that Bridges claimed to be a Communist falls into a class of evidence that is easily given and hard to refute. In view of the authorities cited the danger of mistake which is undeniably present is for the administrative head and for him alone to take. Under the law that burden fell finally and squarely upon the Attorney General. The district judge, whose judgment we are reviewing, and this court would be exercising power we do not legally possess if we should essay to assume that burden. The courts do not have unlimited sanction to attempt the righting of every governmental act which the judges regard as wrong; their first duty is to act only within their limited power.

During the progress of the deportation proceedings three opinions were written; one by the presiding inspector, Judge Sears, formerly of the Court of Appeals of the State of New York, and another by the Board of Immigration Appeals; and a third by the Attorney General. Each of these sets forth in great detail the reasons and bases for the conclusions reached. The Inspector's findings were against the appellant; those of the Board were in his favor; and those of the Attorney General sustained the Inspector. A considerable part of the briefs deals with the reasoning and pronouncements of these various opinions. We are not concerned with the mental processes by which these conclusions were reached, although it is worthy of mention that the Attorney General stresses the fact that Inspector Sears, with whose determination he agrees, had the witnesses before him and was for that reason better able to adjudge of their credibility than one could be who has merely studied the record.

The briefs before us discuss the question whether or not the appellant was affiliated with the Communist Party or with the Marine Workers' Industrial Union. As the warrant for deportation is supported by the findings of the Attorney General that the appellant was a member of the Communist Party, it is not necessary for us to determine whether there is evidence to support the finding of the Attorney General that appellant was affiliated with that organization or with the Marine Workers' Industrial Union, or whether or not the latter named organization was a part of the Communist Party. However, lest we be misunderstood, we state that we have carefully reviewed all of the evidence regarding the relation of the Marine Workers' Industrial Union with the Communist Party and appellant's relation to these two

[3] It must not be assumed that the Lundeberg and O'Neil testimony is the only relevant testimony in the case. We discuss this testimony because of its importance and because of the attack made upon it by appellant.

organizations. This review has convinced us that there is evidence to support the findings of the Attorney General that the Marine Workers' Industrial Union was a part of the Communist Party and that appellant was affiliated with it during the period of the longshoremen's strike. It may be stated arguendo that appellant, in his management of that strike, was attacking most vicious and inhumane practices toward longshoremen and that he was justified in accepting help from any quarter. The very bad conditions referred to were amply established by the evidence but this circumstance does not lessen the fact that the evidence adduced before the Inspector supports the inference and the finding that appellant was in affiliation with the organization known as the Marine Workers' Industrial Union.

Likewise, we hold that the evidence supports the Attorney General's findings 4; 5 and 6.

A witness named Maurice J. Cannalonga, who testified in favor of the immigration authorities, and subsequently signed statements repudiating his testimony, was again brought before the Inspector by the immigration authorities after demand by the appellant, and again testified, as he had in the first instance, repudiating his conflicting statements on the ground that he was confused for the reason "he had been hitting the booze heavy then." The testimony of this witness was disregarded, as appears from the statement of the Inspector and the Board of Appeals. It is claimed, however, that when he was placed upon the stand the second time the immigration authorities were cognizant of the fact that he was intending to commit perjury on the stand. It is claimed also that the testimony of this witness was fabricated. In support of the suggestion that this invalidates the whole proceeding, the appellant cites the case of Mooney v. Holohan, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791, 98 A.L.R. 406. That case holds that where the state, through its administrative officers, conspires to use the courts of the state for the purpose of convicting a man known to be innocent, by fabricated testimony, such conduct by the state constitutes a denial by the state of due process.

It is not shown how the government officials could know that a repetition of his testimony theretofore given was perjury even though it were known that after being interviewed by appellant's counsel he had given a statement contrary to the testimony first made under oath in the deportation proceeding. See, Ghiggeri v. Nagle, 9 Cir., 19 F.2d 875.

This aspersion upon the integrity of the Government's attorneys is wholly gratuitous and without foundation in fact.

Order affirmed.

STEPHENS, Circuit Judge (concurring).

I concur in the opinion prepared by Judge WILBUR and in the decision reached therein. To decide otherwise, as it seems to me, would be judicial usurpation of power to meet an unusual situation. One of the maxims of the law is that hard cases make bad law. It cannot be denied that the evidence in this case falls far short of the "clear, unequivocal and convincing" rule the Supreme Court has announced for the review of judgments in denaturalization proceedings. Baumgartner v. United States, 64 S.Ct. 1240; Schneiderman v. United States, 320 U.S. 118, 63 S.Ct. 1333, 87 L.Ed. 1796.

This proceeding, however, does not originate in a court action as those cases do but from an administrative decision. Not only has the Supreme Court never announced the "clear, unequivocal and convincing" rule for such a proceeding, it has never announced that any court in reviewing such a decision can decide whether or not the mere burden of proof has been or has not been sustained. When some evidence supporting the decision has been found, the reviewing court's decision is definitely fixed. See the quotations in the main opinion from Tisi v. Tod, 264 U.S. 131, 133, 44 S.Ct. 260, 68 L.Ed. 590, written by Mr. Justice Brandeis, and from United States ex rel. Vajtauer v. Commissioner of Immigration, 273 U.S. 103, 112, 47 S.Ct. 302, 71 L.Ed. 560, written by Mr. Justice Stone.

In no case have I given the evidence more careful attention than in this one. However, such attention has not left in my mind the pleasurable satisfaction that, barring a very slight possibility of error, the truth has been revealed. Such satisfaction is beside the point here. The simple question this court must answer is: Is there some evidence to sustain the charges? There is.

I am authorized to say that Judges WILBUR and MATHEWS are in agreement with these expressions.

HEALY, Circuit Judge (dissenting).

It was not charged nor is there evidence that the alien has advocated the forcible overthrow of the government of the United States. Nor was there charge or proof that he entertained views inimical to constitutional government, or that he at any time possessed or distributed literature subversive of the Constitution. The accusation is that he was a member of or was affiliated with an organization, namely, the Communist party, which did those things. This accusation the alien has countered with a flat and unequivocal denial. For those who cherish traditions of American justice it is permissible to believe that the alien should not be deprived of his freedom to remain here unless the truth of the accusation be fairly established. That it was not so proven must be patent, I think, to any candid person who takes the trouble to examine the record.

I am aware that in a proceeding of this nature the court is powerless to review or weigh the evidence in the ordinary sense. It is not my purpose to do more than consider its adequacy in the light of the whole record. I desire particularly to point out what seems to me to be the fact, namely, that the crucial finding in the case was arrived at in reliance upon incompetent evidence—evidence, moreover, received and considered in violation of a regulation of the Department designed to insure fair hearings and to safeguard the rights of aliens. If this be true, I think it follows that the alien was not accorded due process.

Bridges is a native of Australia. He came to the United States as a sailor in the year 1920.[1] His entry was lawful and he had and has the legal right to remain unless he has transgressed some act of Congress authorizing his expulsion. Some years after his arrival he became a long-

shoreman in San Francisco where he was active in establishing the International Longshoremen's Association (affiliated with the American Federation of Labor) as opposed to company-controlled unions of longshoremen then functioning on the waterfront.[2] The ILA, as is conceded, was a legitimate union organized to combat practices toward longshoremen which my associates in the majority appropriately characterize as "vicious and inhumane." In the maritime strike of 1934 the union strove effectively to remedy these substandard practices.[3] During the strike the alien was chairman of the joint strike committee of the participating unions. He became, so to speak, a storm-center of bitter industrial controversy, accumulating many enemies and earning the hostility of powerful interests.

For a period of several years following the strike certain volunteer organizations, notably the Portland police and a committee of the American Legion headed by one Knowles, embarked actively on a far-flung search for evidence upon which the alien might be deported. The Immigration Service, spurred on apparently by complaints of Knowles, itself made investigations and checked on information called to its attention by the private inquisitors. But in 1936 the Service reported its inability to discover grounds for deportation.

In 1938 a deportation warrant was issued on charges identical with those made in the later proceeding with which we are here directly concerned. Before the trial began the Supreme Court decided Kessler v. Strecker, 307 U.S. 22, 59 S.Ct. 694, 83 L.Ed. 1082, whereupon the warrant was amended to charge that the alien "both was and is" a member of or affiliated with the proscribed organization. The hearing on the charges, conducted before Dean Landis as trial examiner, continued almost un-

[1] In 1921 he filed first papers for naturalization. Application for final papers made in 1928 was denied on the ground that the 7-year period for filing had elapsed. He filed first papers again in 1928, but these were again permitted to lapse. He filed first papers for the third time in 1936 and this application was still pending at the time of the trial.

[2] Bridges was president of this union from 1934 to 1937, when it became affiliated with the CIO, changing its name to International Longshoremen and Warehousemen's Union. Bridges was then elected president of the Pacific Coast district for the CIO and apparently still occupies this post.

[3] The evils giving rise to the strike are described in detail by Presiding Inspector Sears who states that it was the company-controlled, or "Blue-Book Unions," which enabled the employers to perpetuate the practices described. "These company unions," said Inspector Sears, "were in existence on the waterfront until October, 1933, when they were forced out of existence by the newly revived and militant ILA Union, of which Bridges became an early member."

940

interruptedly over a period of eleven weeks, being finally closed in September 1939. In all forty-five days were occupied in the actual taking of testimony. The testimony covered 7,724 pages, exclusive of 274 exhibits. The examiner found that the evidence established neither the alien's membership in nor his affiliation with the Communist party. The report and proposed findings were accepted by the Department and the warrant of arrest was cancelled.

There followed the statutory amendment of June 28, 1940, designed to avoid the holding in Kessler v. Strecker, supra. From the legislative history of the amendment it is evident that its proponents had the Bridges case specifically in mind.[4] A second warrant was issued in February 1941 and a second hearing had, this time before presiding inspector Sears. This hearing continued over a period of two and a half months, the testimony adduced totaling 7,546 typewritten pages exclusive of 359 exhibits, 297 of which were introduced by the government. Much of the evidence taken at the prior hearing was read into the record, and the two inquiries largely covered the same territory. The trial eventuated as described in the majority opinion, the inspector's findings of membership and affiliation being set aside by the Board of Immigration Appeals and thereafter reinstated by the Attorney General.

It is notable that the alien, in one fashion or another, had been under almost continuous investigation for a period of more than five years. Prior to and during the course of the second trial the Service had enlisted the powerful cooperation of the Federal Bureau of Investigation. The country had been scoured for witnesses, every circumstance of Bridges' active life had been subjected to scrutiny, and presumably no stone left unturned which might conceal evidence of the truth of the charges which the alien so flatly denied. The most significant feature of the inquiry, as it seems to me, is the paucity of the evidentiary product as contrasted with the magnitude of the effort expended in producing it.

The finding of Communist party membership presents the crux of the case. This finding rests upon two items of evidence.

One of these is the testimony of the witness Lundeberg concerning his recollection of a remark said to have been made by the alien in a conversation occurring six years before. The other consists of an unsworn and later disavowed oral statement of a man named O'Neil.

Before looking at the testimony of these two men I turn briefly to circumstances said to establish the alien's "affiliation" with the Communist party as distinguished from membership therein. In the main there is no dispute concerning these circumstances. The bulk of them had long been known alike to the authorities and to the general public, and were freely admitted by the alien himself. Nearly all of them had been evaluated and discarded by inspector Landis and by the Department upon the first trial. They relate to the alien's willingness to accept help from Communist quarters during the course of the longshoremen's strike; to the fact that there were Communists among Bridges' associates; to the alien's public denunciation of "redbaiters" as no true friends of labor; to his participation, before and during the strike, in the editing of a mimeographed sheet called the Waterfront Worker in which was printed news relating to the strike and articles designed to inform readers of the economic ills from which the longshoremen suffered. It is not claimed that the contents of this partisan paper were suggestive of Communist doctrine; the significance of the circumstance is said to rest in the fact that the paper had been started by the Marine Workers Industrial Union (an allegedly Communist front organization), shortly abandoned by that group, and thereafter taken over by Bridges and his associates and issued from the former address. There is the related circumstance, heavily stressed by the Service, that Bridges' union and the Marine Workers Industrial Union, both of which were participants in the maritime strike, rendered mutual assistance in the course of it. Hence the finding of affiliation with the MWIU.

The alien, who was nothing if not a forthright witness, made no effort to minimize or excuse the facts. He pointed merely to the reasons impelling his conduct. He would, he said, "probably do the

---

[4] A private bill for the deportation of Bridges, "notwithstanding any other provision of law," actually passed the House. It was rejected in the Senate after a protest by Attorney General Jackson, now a member of the supreme bench. S.Rep. No. 2031, 76th Cong., 3rd Sess.

same thing again." His concern was not with the opinions of men, but to win the strike If a man was a good unionist he was for him, if a bad unionist he was against him. If it is permissible to compare small things with great, one may remark that the bonds which today unite our people with the Soviet Union afford a striking analogy to those which in 1934 linked Bridges with the MWIU. Surely no one would suggest that a liaison dictated by the necessities of a common struggle for survival make of our people or of our government "affiliates" of the Communist party.

On this aspect of the inquiry the problem is not one of conflicting inferences to be drawn from conceded facts. Involved, rather, is the question of the meaning of the term "affiliation" as employed in the statute. The question is one of law. Dean Landis pertinently observed that "affiliation" means more than sympathy and implies a stronger bond than mere association. One must not here lose sight of the policy of the law. In condemning "affiliation" with a proscribed group it would seem that Congress had in mind a working arrangement of some sort designed, or at least having a substantial tendency, to further the subversive aims of the group. A temporary or occasional joinder of forces for the attainment of an end entirely legitimate in itself, as for example, the betterment of substandard conditions of workers in a given industry, can hardly be thought to fall within the legislative ban. I suppose that in every-day practice even Communists have their constructive moments.

For the most part the cases dealing with the term "affiliation" involve facts so much stronger than the present that they are of little aid to decision. Perhaps the fullest discussion of the term is found in United States ex rel. Kettunen v. Reimer, 2 Cir., 79 F.2d 315, 317. Said Judge Chase, who

wrote the opinion: "In deciding this case, we shall not attempt to give a comprehensive definition of the word 'affiliation' as used in the statute. Very likely that is as impossible as it is now unnecessary. It is enough for present purposes to hold that it is not proved unless the alien is shown to have so conducted himself that he has brought about a status of mutual recognition that he may be relied on to co-operate with the Communist Party on a fairly permanent basis. He must be more than merely in sympathy with its aims or even willing to aid it in a casual intermittent way. Affiliation includes an element of dependability upon which the organization can rely which, though not equivalent to membership duty, does rest upon a course of conduct that could not be abruptly ended without giving at least reasonable cause for the charge of a breach of good faith. So tested we cannot agree that there was evidence to establish that this relator was affiliated with the Communist Party. His application for membership would indicate his then sympathy with its aims, but his reconsideration and failure to join shows his unwillingness to let his sympathy control his action, and there is no proof which shows any mutual recognition that co-operation was to be expected from him." [5]

The Attorney General was not at pains to explain his understanding of the statutory term. In arriving at his finding of affiliation he appears to have relied indiscriminately on every circumstance which might be thought to spell sympathy or to be indicative of an association however temporary or in pursuit of ends however legitimate. His finding on this issue is without substantial evidentiary support.

I turn now to the evidence of party membership. Lundeberg testified that in a conversation had in 1935 at Bridges' home the alien said "I am a Communist." This wit-

[5] In United States ex rel. Yokinen v. Commissioner, 2 Cir., 57 F.2d 707, 708, Judge Augustus Hand said: "It is enough that the alien Yokinen, by pledging himself to perform certain tasks prescribed by the Communist Party in order to secure reinstatement, must be regarded as affiliated with it." And in an unreported opinion, Tolsky v. Wilson (S.D.N.Y.), June 22, 1920, Judge Learned Hand said: "As to affiliation the case is not so clear, and depends upon how one defines that word. I take it to mean a relation of coopera-tion between the members of two or more organizations. Perhaps it may also include an irregular connection of a single individual with the society, not amounting to membership. However this may be, it seems to me pretty clear that it involves a mutual recognition of permanent cooperation between the organization and the person affiliated and not a spasmodic or casual assistance. Mere sympathy with the aims of the society, even accompanied by efforts to further its aims, does not fall within that word."

ness was the head of a rival union. His attitude toward the alien was admittedly one of implacable hostility. His story, under persistent leading questions, grew more specific with each repetition of it. The four participating members of the Board of Immigration Appeals unanimously rejected it as unworthy of credence. The Board called attention to the avowed enmity of the witness, to the enlargement of his story while on the stand under the prompting of government counsel, to his incurable evasiveness under cross-examination, to the man's prior inconsistent statements made under solemn circumstances and more than once repeated. On the other hand the presiding inspector and the Attorney General thought Lundeberg a credible witness. As a matter of course, the court, whatever its own view, is not at liberty to choose between the conflicting appraisals of credibility by the officials charged with the responsibility of determining the facts. I point to the disagreement as disclosing how closely the proof here approaches if it does not cross the borderline of inadequacy.

The remaining evidence on the point is that of O'Neil, a man whom the Board of Appeals, not without ample warrant, characterized as "a theatrical, sensation-loving braggart." O'Neil is reported as having said to representatives of the Service, in the course of their investigations, that in 1937 he entered Bridges' office in the middle of an afternoon and found the alien sitting at his desk openly posting stamps representative of Communist party dues. The statement to this effect, assuming it to have been made, was not given under oath, was not signed, nor does any effort appear to have been made to obtain the man's oath or signature. When called by the Service and sworn O'Neil denied having said the things attributed to him. Further, he categorically denied that the incident had ever occurred and declared that he had no information as to Bridges' membership in the Communist party. The alleged statement was thereupon offered and received in evidence over the alien's objection. It was accepted and relied upon by the presiding inspector and by the Attorney General as affording affirmative proof of party membership. The Board of Appeals thought the statement inadmissible for any purpose other than impeachment. That body was doubtful even of its admissibility for impeachment purposes, and I think properly so since the government was obviously not surprised and O'Neil had given no testimony damaging to the government's case. There was no point in impeaching him.

The field of use of ex parte statements in deportation proceedings is carefully delimited by Departmental rules. Such statements, when their possible use as evidence is contemplated, are required by the rules to be taken under oath or affirmation, "recorded" (i. e. reduced to writing), and signed by the relator.[6] These precautionary requirements are elementary and may be said to prescribe the minimum of fairness.[7]

The rules, adopted as they were under authority and direction of law, are part and parcel of the regulations "governing the arrest and deportation of aliens."[8] They were disregarded here. The Attorney General so concedes in his decision. He excused their violation on the specious plea that they "were not called to the attention of the presiding inspector." However, they were called to the Attorney General's attention. One is left to wonder on what ground that high official condoned his own disregard of them. Upon him rested the inescapable responsibility of accepting or rejecting the evidence, as of ordering the deportation. The rules were obligatory on him if on anybody. To toss them aside for reasons deemed expedient in a particular case amounts to the substitution of a government of men for a government of law. There are numerous and persuasive decisions to the effect that the disregard by

---

[6] Regulations § 150.1 [c], [d]; § 150.6 [i].

[7] The Board of Appeals, in commenting on the purpose of the rules, said: "Here a written statement at the Schofield interview would have guarded against mistake in hearing, memory or transition. As to both statements, the oath and signature of the maker would at least have shown O'Neil to be, on two occasions, willing to pin himself down, and to do so under oath, thus providing the safeguard of fear of perjury pros-

ecution; and, contrariwise, had he been asked to swear and sign and refused, the fact of his unwillingness, on two occasions, so to pin himself down, would have been of no small weight in evaluating the truth of the statements made."

[8] Fed.Reg. January 4, 1941, p. 68. The revised regulations appear to have been the outgrowth of much study and experience. Consult report of the Committee on Administrative Procedure, Immigration and Naturalization Service, Dept. of Labor, May 1940.

officials of departmental rules on which the rights of aliens depend amounts to a denial of due process.[9] I have found no authorities to the contrary.[10]

Apart from non-observance of the regulations, the situation is no better. Of course the mere reception of incompetent evidence does not invalidate a hearing; but error in reliance upon such evidence may, in appropriate circumstances, go to the substance of a fair trial.[11] The real inquiry is whether the practice was "such as might have led to a denial of justice." [12] In this instance the remaining showing of party membership was of so flimsy a character as to lead the Appeals Board to reject it entirely. The Attorney General's acceptance of the O'Neil hearsay as probative evidence might easily have served to tip the scale. I am satisfied it did so.

To be sure, the ordinary rules relating to the reception of evidence are not generally applied in administrative hearings. The reasons underlying this departure from judicial practice have often been stated.[13] Administrative proceedings are in the main informal, are frequently not conducted with the aid of counsel or heard by men trained in the law, and of necessity they are often of a summary nature. None of these reasons obtained in this instance. The hearing was conducted before a train-ed judge, and both the Service and the alien were represented by experienced counsel. There was ample time and opportunity to observe the precautions thought by the courts to be essential to a fair trial. Moreover, the case, unlike the mine run of administrative hearings, was one in which the liberty of a human being was at stake. Surely it presented an occasion where "the more liberal the practice in admitting testimony, the more imperative the obligation to preserve the essential rules of evidence by which rights are asserted or defended." [14]

As applied to the situation here presented, arguments predicated on the "protective weapon" of cross-examination are without validity. A witness who denies ever having made an alleged prior statement and who denies all knowledge of the facts purportedly then stated offers no target against which the weapon may be employed. The infirmity of the O'Neil hearsay cuts across all rules. No amount of philosophizing can serve to make a silk purse out of this obvious sow's ear. Rather than deport the alien on evidence which would be condemned and proscribed without hesitation by any American court it would seem a more forthright procedure to do what was proposed in the first place, deport him by legislative resolution "not-

[9] Consult particularly Sibray v. United States ex rel. Plichta, 3 Cir., 1922, 282 F. 795 (violation of Rule 5[b] relating to the reading to the alien of the evidence on which the warrant was based); United States ex rel. Chin Fook Wah v. Dunton, D.C., 288 F. 959, decision by Judge Augustus Hand (relating to Rule 3 providing that the alien might have a friend or relative present during the hearing); Mah Shee v. White, 9 Cir., 242 F. 868 (relating to Rule 5[c] governing the alien's right to forward new evidence to the Secretary along with the record); Ex parte Radivoeff, D.C., 278 F. 227 (violation of Rule 22 relating to examination by the alien of evidence on which warrant was issued). Consult, also, Whitfield v. Hanges, 8 Cir., 222 F. 745, opinion by Judge Sanborn.

[10] Cf. United States ex rel. Bilokumsky v. Tod, 263 U.S. 149, 155, 44 S.Ct. 54, 68 L.Ed. 221; Tisi v. Tod, 264 U.S. 131, 134, 44 S.Ct. 260, 68 L.Ed. 590. Seif v. Nagle, 9 Cir., 14 F.2d 416, cannot fairly be thought contra.

[11] The majority opinion quotes extensively from the opinion of Justice Brandeis in Tisi v. Tod, 264 U.S. 131, 44 S.Ct. 260, 261, 68 L.Ed. 590. Omit-ted, however, from the quotation is the following significant passage which is the essence of the decision: "But here no hasty, arbitrary, or unfair action on the part of any official, or any abuse of discretion, is shown. There is no claim that the lack of legal evidence of knowledge was manifest, or that the finding was made in willful disregard of the evidence to the contrary, or that settled rules of evidence were ignored. The procedure prescribed by the rules of the department appears to have been followed in every respect, and the legality of that prescribed is not questioned."

[12] Cf. language of Justice Brandeis in United States ex rel. Bilokumsky v. Tod, 263 U.S. 149, 157, 44 S.Ct. 54, 57, 68 L.Ed. 221.

[13] 1 Wigmore on Evidence, 3rd Ed. 1940, § 4(a), (b); Landis, Crucial Issues in Administrative Law, 53 Harvard Law Review 1077 (1940); Davis, An Approach to Problems of Evidence in the Administrative Process, 55 Harvard Law Review 364 (1942).

[14] Interstate Commerce Commission v. Louisville & Nashville R. R. Co., 227 U.S. 88, 93, 33 S.Ct. 185, 187, 57 L.Ed. 431.

withstanding the provisions of any other law."

I think the judgment should be reversed with directions to grant the petition.

I am authorized to say that Judge GARRECHT agrees with this opinion.

On Petition for Rehearing.

STEPHENS, Circuit Judge.

The petition for rehearing stresses the point that the majority and concurring opinions in this case state that there is "evidence" and that there is "some evidence" which supports the order of deportation. The implication is that these terms were used as including a mere scintilla of evidence.

Federal courts do not regard a mere scintilla of evidence as effective for any purpose, and it is my understanding that in using the word "evidence" the idea of the mere scintilla was never considered.

Where there is evidence, more than a scintilla and not unbelievable upon its face, the administrative head must resolve the doubts as to its credibility. Upon this rule we have determined appeals in habeas corpus proceedings and reviews from administrative orders without regard to our own views as to the fact finder's discretionary conclusions.

The advisability of liberalizing this rule is currently the subject of much discussion, but whatever the ultimate action may be upon such issue of policy by those having the power to change it, it is clear to me that this intermediary court must adhere to the rule as it presently exists. We cannot make fish of one administrative order and fowl of another. Therefore, I vote to deny the petition for rehearing.