FEDERAL TRADE COMMISSION *v.* ALGOMA LUMBER CO. ET AL.

No. 240. Argued December 14, 15, 1933.—Decided January 8, 1934.

68

*Assistant Attorney General Stephens,* with whom *Solicitor General.Biggs* and *Messrs. Robert E. Healy, Martin A. Morrison,* and *Eugene W. Burr* were on the brief, for petitioner.

Mr. Allan P. Matthew, with whom Messrs. Warren Olney, Jr., and Carl I. Wheat were on the brief, for respondents.

By leave of Court, Mr. Edward S. Rogers filed a brief as amicus curiae.

MR. JUSTICE CARDOZO delivered the opinion of the Court.

In May, 1929, the Federal Trade Commission filed and served complaints against a group of fifty manufacturers on the Pacific Coast charging " unfair competition in interstate commerce " in violation of § 5 of the Federal Trade Commission Act. 38 Stat. 717, 719, c. 311, § 5; 15 U.S.C. § 45.

After the service of answers the proceedings were consolidated and many witnesses examined. The outcome was a series of reports sustaining the complaints as to thirty-nine manufacturers, with orders to " cease and desist " from the practice challenged as unfair. Twelve companies thus enjoined petitioned the Circuit Court of Appeals for the Ninth Circuit to review the orders of the Commission. Such review being had, the orders were annulled. 64 F. (2d) 618. A writ of certiorari brings the case here.

The practice complained of as unfair and enjoined by the Commission is the use by the respondents of the words " California white pine " to describe lumber, logs or other forest products made from the pine species known as Pinus ponderosa. The findings as to this use and its effect upon the public are full and circumstantial. They are too long to be paraphrased conveniently within the limits of an opinion. We must be content with an imperfect summary.

The respondents are engaged in the manufacture and sale of lumber and timber products which they ship from

California and Oregon to customers in other states and foreign lands. Much of what they sell comes from the species of tree that is known among botanists as *Pinus ponderosa*. The respondents sell it under the name of "California white pine," and under that name, or at times "white pine" simply, it goes to the consumer. In truth it is not a white pine, whether the tests to be applied are those of botanical science or of commercial practice and understanding.

Pine trees, the genus "Pinus," have for a long time been divided by botanists, foresters and the public generally into two groups, the white pine and the yellow. The white pine group includes, by common consent, the northern white pine (*Pinus strobus*), the sugar pine and the Idaho white pine. It is much sought after by reason of its durability under exposure to weather and moisture, the proportion of its heartwood as contrasted with its sapwood content, as well as other qualities. For these reasons it commands a high price as compared with pines of other species. The yellow pine group is less durable, harder, heavier, more subject to shrinkage and warping, darker in color, more resinous, and more difficult to work. It includes the long leaf yellow pine (*Pinus palustris*), grown in the southern states, and the *Pinus ponderosa*, a far softer wood, which is grown in the Pacific coast states, and in Arizona and New Mexico, as well as in the "inland empire" (eastern Washington, Oregon, Idaho, and western Montana).

Of the varieties of white pine, the northern or *Pinus strobus* has been known better and longer than the others. It is described sometimes as northern white pine, sometimes as white pine simply, sometimes with the addition of its local origin, as Maine white pine, Michigan, Wisconsin, Minnesota, Canadian, New Brunswick. It is native to the northeastern states and to the Great Lakes region, as far west as Minnesota. It is found also in Canada and

along the Appalachian highlands. It was almost the only building material for the settlers of New England, and so great is its durability that many ancient buildings made from it in the seventeenth and eighteenth centuries survive in good condition. The sugar pine is native to the upland regions of California, southern Oregon and parts of Nevada. The Idaho white pine grows in the mountainous sections of Idaho, Washington and Oregon and in parts of British Columbia. The white pine species " still holds an exalted reputation among the consuming public " and " in general esteem is the highest type of lumber as respects the excellences desired in soft wood material." " It is coming more and more to be a specialty wood, largely devoted to special purposes, as it becomes scarcer and higher in price. It is in great demand."

About 1880 the *Pinus ponderosa*, though botanically a yellow pine, began to be described as a white pine when sold in the local markets of California, New Mexico, and Arizona, the description being generally accompanied by a reference to the state of origin, as " California white pine," etc. By 1886, sales under this description had spread to Nevada and Utah, with occasional shipments farther east. About 1900, they entered the middle western states, and about 1915 had made their way into New England, though only to a small extent. The pines from the " inland empire " traveled east more slowly, and when they did were described as western white pine, a term now generally abandoned. The progress of the newcomers, both from the coast and from the " inland empire " was not wholly a march of triumph. In their movement to the central and eastern markets they came into competition more and more with the genuine white pine, with which those markets had been long familiar. Mutterings of discontent were heard. In 1924, partly as a result of complaints and official investigations, many of the producers, notably those of the " inland empire," as well as

some producers in California and Arizona, voluntarily
gave up the use of the adjective " white " in connection
with their product, and adopted the description " pondosa
pines," pondosa being a corruption or abbreviation of the
ponderosa of the botanists. " Pondosa pine is the term em-
ployed for ponderosa by the representatives of producers
of slightly more than half of the ponderosa marketed."
The respondents and others, however, declined to make a
change. During the next five years California white pine
and its equivalents became an even more important factor
in the lumber markets of the country. Accumulating
complaints led to an inquiry by the Commission, which
had its fruit in this proceeding.

The confusion and abuses growing out of these inter-
locking names have been developed in the findings. Many
retail dealers receiving orders for white pine deliver Cali-
fornia white pine, not knowing that it differs from the
lumber ordered. Many knowing the difference deliver
the inferior product because they can buy it cheaper.
Still others, well informed and honest, deliver the genuine
article, thus placing themselves at a disadvantage in the
race of competition with the unscrupulous and the igno-
rant. Trade has thus been diverted from dealers in white
pine to dealers in *Pinus ponderosa* masquerading as white
pine. Trade has also been diverted from dealers in *Pinus
ponderosa* under the name pinus pondosa to dealers in
*Pinus ponderosa* under the more attractive label. The
diversion of trade from dealers of one class to dealers of
another is not the only mischief. Consumers, architects
and retailers have also been misled. They have given
orders for the respondents' product, supposing it to be
white pine and to have the qualities associated with lum-
ber of that species. They have accepted deliveries under
the empire of that belief. True indeed it is that the
woods sold by the respondents, though not a genuine

white pine, are nearer to that species in mechanical properties than they are to the kinds of yellow pine indigenous to the south. The fact that for many purposes they are half way between the white species and the yellow makes the practice of substitution easier than it would be if the difference were plain. Misrepresentation and confusion flourish in such a soil. From these findings and others the Commission was brought to the conclusion that the respondents compete unfairly in transacting business as they do, and that in the interest of the public their methods should be changed.

" The findings of the Commission as to facts, if supported by testimony, shall be conclusive." 15. U.S.C. § 45. The Court of Appeals, though professing adherence to this mandate, honored it, we think, with lip service only. In form the court determined that the finding of unfair competition had no support whatever. In fact what the court did was to make its own appraisal of the testimony, picking and choosing for itself among uncertain and conflicting inferences. Statute and decision (*Federal Trade Comm'n* v. *Pacific States Paper Trade Assn.*, 273 U.S. 52, 61, 63) forbid that exercise of power.

*First.* The argument is made that unfair competition is disproved by the " simplified practice recommendations " of the Bureau of Standards when read in conjunction with the testimony as to the comparative utility of the genuine white pine and *Pinus ponderosa.*

The Court of Appeals concedes that the recommendations of the Bureau will not avail, without more, to control the action of the Commission. Cf. *Brougham* v. *Blanton Mfg. Co.*, 249 U.S. 495, 499; *Piedmont & Northern Ry. Co.* v. *Interstate Commerce Comm'n*, 286 U.S. 299, 312. The view was expressed, however, that alone they are in a high degree persuasive, and that in conjunction with other evidence they are even controlling. In

74

particular that result was thought to follow in this case because the substituted wood, in the judgment of the court, is so nearly equal in utility that buyers are not injured, even though misled.[1]

Such a holding misconceives the significance of the Government's endeavor to simplify commercial practice. It misconceives even more essentially the significance of the substitution of one article for another without notice to the buyer.

(a) The Bureau of Standards is a branch of the Department of Commerce. At its instance representatives of manufacturers, sellers, and users of lumber, as well as architects, engineers and others, met in conference at various times between 1922 and 1928 in an endeavor to simplify methods of business in the lumber industry. Following these conferences the Bureau in 1929 issued a report entitled " Lumber, Simplified Practice Recommendations." Many subjects that were considered are without relation to this case. The report dealt with standards of size, of inspection, of structural material, and other cognate themes. One of its subdivisions, however, enumerates the standard commercial names for lumber of many types. Sixteen names of pines are stated in the list, and among them is the name " California white pine " with its botanical equivalent, *Pinus ponderosa.*

The recommendations of the Bureau of Standards for the simplification of commercial practice are wholly

---

[1] " It would not necessarily follow . . . that a yellow pine might be sold as a white pine if such sales were unfair to the trade and injurious to the public, notwithstanding the Bureau of Standards had specified a name such as ' California white pine ' in a list of ' Standard commercial names ' for pine lumber. It would be different; however, if the particular lumber sold under such name possessed substantially the same qualities possessed by the white pines of commerce as distinguished from certain well known commercial yellow pines." 64 F. (2d) 618 at p. 620.

advisory. Dealers may conform or diverge as they prefer. The Bureau has defined its own function in one of its reports. The Purpose and Application of Simplified Practice, National Bureau of Standards, Department of Commerce, July 1, 1931, pp. 2, 7, 10, 17. "Simplified practice is a method of eliminating superfluous variety through the voluntary action of industrial groups." "The Department of Commerce has no regulatory powers" with reference to the subject and hence "it is highly desirable that this recommendation be kept distinct from any plan or method of governmental regulation or control." There is nothing to show that in making up the list of names the Bureau made any investigation of the relation between *Pinus ponderosa* and the white pines of the east. Certainly it had no such wealth of information on the subject as was gathered by the Commission in the course of this elaborate inquiry. There is nothing to show to what extent its advice has been accepted by the industry. The record does show that the recommendation does not accord with the practice of other governmental agencies. For example, the United States Forest Service in its publications and forest signs describes the ponderosa species as western yellow pine. In such circumstances the action of the Bureau was at most a bit of evidence to be weighed by the Commission along with much besides. It had no such significance as to discredit in any appreciable degree a conclusion founded upon evidence otherwise sufficient. The powers and function of the two agencies of government are essentially diverse. The aim of the one is to simplify business by substituting uniformity of methods for wasteful diversity, and in the achievement of these ends to rely upon coöperative action. The aim of the other is to make the process of competition fair. There are times when a description is deceptive from the very fact of its simplicity.

(b) The wood dealt in by the respondents is not substantially as good as the genuine white pine, nor would sales under the wrong name be fitting if it were.

The ruling of the court below as to this is infected by a twofold error. The first is one of fact. The supposed equivalence is unreal. The second is one of law. If the equivalence existed, the practice would still be wrong.

The Commission found as a fact that the genuine white pine is superior for many reasons to *Pinus ponderosa,* and notably because of its greater durability. The court held the view that the difference in durability had not been proved so clearly as to lay a basis for the orders, and this, it seems, upon the ground that though the superiority exists, the evidence fails to disclose its precise degree. " What the testimony appears to establish is that Northern white pine has relatively a greater durability for exterior use without establishing any comparative degree of such durability." 64 F. (2d) 618 at p. 622.

Court and counsel for the respondents lean heavily at this point upon the testimony of the Director of the United States Forest Products Laboratory at Madison, Wisconsin, and his assistant Mr. Hunt. The Director testified that he did not know the comparative durability of the pines, and would refer any inquirer to specialists, of whom Mr. Hunt was one. The testimony of Mr. Hunt is that there have been no tests in a strict sense, but that the comparison between the white pines and *Pinus ponderosa* has been based upon observation and opinion. He continues: " The general experience with the use of the white pines, during the two hundred years since they began to be used, indicated that those pines had moderately high durability. The general experience with *Pinus ponderosa* indicated that that wood had low durability in contact with the ground or any place favoring the growth of decay. That is a matter of common knowledge." Inquirers at the Laboratory were accordingly advised that " the

heartwood of the white pine has more decay resistance, will give longer service under conditions favoring decay than the heartwood of pinus ponderosa," and " the mill run of the white pine probably would average higher in durability under decay producing conditions."

This testimony, even if it stood alone, would tend to sustain rather than to discredit the findings by the Commission that the genuine white pines are materially superior to the woods that the respondents are selling as a substitute. It is fortified, however, by evidence from many other sources. To be sure there is contradiction which we have no thought to disparage. For present purposes we assume the credibility of those who spoke for the complainants. Wholesalers, retailers, manufacturers, lumber graders, laboratory experts and others bore witness to the comparative merits of the woods, stating their own experience as well as common opinion among their fellows in the industry. If all this may be ignored in the face of the findings of the Commission, it can only be by turning the court into an administrative body which is to try the case anew.

What has been written has been aimed at the position that *Pinus ponderosa* is as good or almost as good as the white pines of the east. We have yet to make it plain that the substitution would be unfair though equivalence were shown. This can best be done in considering another argument which challenges the finding of the Commission that there has been misunderstanding on the part of buyers. To this we now turn.

*Second.* The argument is made that retailers and consumers are not shown to have been confused as to the character of the lumber supplied by the respondents, and that even if there was confusion there is no evidence of prejudice.

Both as to the fact of confusion and its consequences the evidence is ample. Retailers order " white pine " from

78

manufacturers and take what is sent to them, passing it on to their customers. At times they do' this knowing or suspecting that they are supplying California white pine instead of the genuine article, and supplying a wood that is inferior, at least for the outer parts of buildings. Its comparative cheapness creates the motive for the preference. At times they act in good faith without knowledge of the difference between the California pines and others. Architects are thus misled, and so are builders and consumers. There is a suggestion by the court that for all that appears the retailers, buying the wood cheaper, may have lowered their own price, and thus passed on to the consumer the benefit of the saving. The inference is a fair one that this is not always done, and perhaps not even generally. If they lower the price at all, there is no reason to believe that they do so to an amount equivalent to the saving to themselves.

But saving to the consumer, though it be made out, does not obliterate the prejudice. Fair competition is not attained by balancing a gain in money against a misrepresentation of the thing supplied. The courts must set their faces against a conception of business standards so corrupting in its tendency. The consumer is prejudiced if upon giving an order for one thing, he is supplied with something else. *Federal Trade Comm'n* v. *Royal Milling Co.*, 288 U.S. 212, 216; *Carlsbad* v. *W. T. Thackeray & Co.*, 57 Fed. 18. In such matters, the public is entitled to get what it chooses, though the choice may be dictated by caprice or by fashion or perhaps by ignorance. Nor is the prejudice only to the consumer. Dealers and manufacturers are prejudiced when orders that would have come to them if the lumber had been rightly named, are diverted to others whose methods are less scrupulous. "A method inherently unfair does not cease to be so because those competed against have become aware of the wrongful practice." *Federal Trade Comm'n* v. *Winsted*

*Hosiery Co.*, 258 U.S. 483, 494.[2]   The careless and the unscrupulous must rise to the standards of the scrupulous and diligent.   The Commission was not organized to drag the standards down.

*Third*. The argument is made that the name for the respondents' lumber was adopted more than thirty years ago without fraudulent design, and that a continuation of the use is not unfair competition, though confusion may have developed when the business, spreading eastward, attained national dimensions.

The Commission made no. finding as to the motives animating the respondents in the choice of the contested name.   The respondents say it was chosen to distinguish their variety of yellow pine from the harder yellow pines native to the southern states.   We may assume that this is so.   The fact remains, however, that the pines were not white either botanically or commercially, though the opportunity for confusion may have been comparatively slight when the sales were restricted to customers in local markets, buying for home consumption.   Complaints, if there were any, must have been few and inarticulate at a time when there was no supervisory body to hold business to its duty.   According to the law as then adjudged, many competitive practices that today may be suppressed (*Federal Trade Comm'n* v. *Winsted Hosiery Co.*, *supra*), were not actionable wrongs, the damage to the complainants being classified often as collateral and remote. *American Washboard Co.* v. *Saginaw Mfg. Co.*, 103 Fed. 281, 286.[3]   The Federal Trade Commission was not organized till 1914, its jurisdiction then as now confined to interstate and foreign commerce.   Silence up to that time is

[2] The many cases in which the Federal Trade Commission has acted to prevent misbranding or like misrepresentation will be found collected in Henderson, The Federal Trade Commission, p. 182, *et seq.*

[3] The cases are reviewed by Henderson, The Federal Trade Commission, p. 179, *et seq.*

not even a faint token that the misapplied name had the approval of the industry. It may well have meant no more than this, that the evil was not great, or that there was no champion at hand to put an end to the abuse. Even silence thereafter will not operate as an estoppel against the community at large, whatever its effect upon individuals asserting the infringement of proprietary interests. *French Republic* v. *Saratoga Vichy Co.*, 191 U.S. 427. There is no bar through lapse of time to a proceeding in the public interest to set an industry in order by removing the occasion for deception or mistake, unless submission has gone so far that the occasion for misunderstanding, or for any so widespread as to be worthy of correction, is already at an end. Competition may then be fair irrespective of its origin. This will happen, for illustration, when by common acceptation the description, once misused, has acquired a secondary meaning as firmly anchored as the first one. Till then, with every new transaction, there is a repetition of the wrong.

The evidence here falls short of establishing two meanings with equal titles to legitimacy by force of common acceptation. On the contrary, revolt against the pretender, far from diminishing, has become increasingly acute. With the spread of business eastward, the lumber dealers who sold pines from the states of the Pacific Coast were involved in keen competition with dealers in lumber from the pines of the east and middle west. In the wake of competition came confusion and deception, the volume mounting to its peak in the four or five years before the Commission resolved to act. Then, if not before, misbranding of the pines was something more than a venial wrong. The respondents, though at fault from the beginning, had been allowed to go their way without obstruction while the mischief was not a crying one. They were not at liberty to enlarge the area of their business without adjusting their methods to the needs of new con-

ditions. An analogy may be found in the decisions on the law of trade marks, where the principle is applied that a name legitimate in one territory may generate confusion when carried into another, and must then be given up. *Hanover Milling Co.* v. *Metcalf,* 240 U.S. 403, 416; *United Drug Co.* v. *Rectanus Co.,* 248 U.S. 90, 100. More than half the members of the industry have disowned the misleading name by voluntary action and are trading under a new one. The respondents who hold out are not relieved by innocence of motive from a duty to conform. Competition may be unfair within the meaning of this statute and within the scope of the discretionary powers conferred on the Commission, though the practice condemned does not amount to fraud as understood in courts of law. Indeed there is a kind of fraud, as courts of equity have long perceived, in clinging to a benefit which is the product of misrepresentation, however innocently made. *Redgrave* v. *Hurd,* L.R. 20 Ch.D. 1, 12, 13; *Rawlins* v. *Wickham,* 3 De G. & J. 304, 317; *Hammond* v. *Pennock,* 61 N.Y. 145, 152. That is the respondents' plight today, no matter what their motives may have been when they began. They must extricate themselves from it by purging their business methods of a capacity to deceive.

*Fourth.* Finally, the argument is made that the restraining orders are not necessary to protect the public interest (see *Federal Trade Comm'n* v. *Royal Milling Co., supra*), but to the contrary that the public interest will be promoted by increasing the demand for *Pinus ponderosa,* though it be sold with a misleading label, and thus abating the destruction of the pine forests of the east.

The conservation of our forests is a good of large importance, but the end will have to be attained by methods other than a license to do business unfairly.

The finding of unfair competition being supported by the testimony, the Commission did not abuse its discretion in reaching the conclusion that no change of the

name short of the excision of the word "white" would give adequate protection.

The judgment is

*Reversed.*